FILED BY [signature] D.C.
AUG 24 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**NICK MILETAK-IN PRO PER**

**Plaintiff,**

**v.** **CASE NO.:**

**POINT DIGITAL FINANCE, INC.,**

**Defendant.**

_______________________________________/

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff Nick Miletak, proceeding pro se, sues Defendant Point Digital Finance, Inc. ("Point"), and alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from Point's affirmative placement and subsequent failure to timely remove a mortgagee and loss-payee designation from Plaintiff's homeowners-insurance records in connection with a proposed home-equity transaction that never closed, was never funded, and never resulted in Point acquiring any mortgage, lien, assignment, or other interest in Plaintiff's property.

2. During Point's underwriting of Plaintiff's proposed home-equity transaction, Point affirmatively instructed Plaintiff's homeowners insurer, AAA Insurance ("AAA"), to identify Point as a loss payee in the second lien position, even though Point had not funded the transaction and no Point mortgage or other lien had been recorded.

3. Point's own communication concerning that designation contemplated that Point would take further action concerning the insurance designation after the proposed transaction closed.

4. The proposed transaction did not close.

5. Point subsequently denied Plaintiff's application, advanced no funds, and acquired no mortgage, lien, assignment, security interest, or other enforceable interest in Plaintiff's residence.

6. Despite termination of the proposed transaction, Point failed for approximately nine months after denying the application to instruct AAA to remove the mortgagee/loss-payee designation Point itself had requested.

7. The inaccurate designation subsequently appeared in insurance information used in connection with Plaintiff's later homeowners policy issued by Trident Reciprocal Exchange ("Trident").

8. When Plaintiff resolved a homeowners-insurance claim with Trident in June 2026, Trident discovered Point's purported mortgagee status and informed Plaintiff that Point could not simply be omitted from the settlement payment unless documentation established that Point had no interest in Plaintiff's property.

9. Trident therefore required additional documentation and modification of the settlement paperwork before payment could proceed.

10. Only after Plaintiff discovered the problem and raised it on June 24, 2026 did Point instruct AAA to remove Point's loss-payee/mortgagee clause because, in Point's words, "the application did not go through."

11. Point subsequently confirmed in writing through its legal department that Plaintiff's application had been denied, the proposed transaction had never been funded, and Point had never held a recorded mortgage, assignment, or other lawful interest in Plaintiff's property.

12. Plaintiff seeks recovery of economic damages proximately caused by Point's conduct, including loss of use of funds, expenses reasonably incurred to investigate and correct the designation, and consequential economic damages proved through admissible evidence.

13. Plaintiff does not contend merely that Point made an unsuccessful lending decision. The challenged conduct is Point's affirmative creation and continued maintenance of an insurance designation representing a mortgagee or loss-payee interest after the underlying transaction failed and no such property interest existed.

## II. JURISDICTION AND VENUE

14. Plaintiff is a citizen of Florida.

15. Point is a corporation incorporated under the laws of Delaware and, upon information and belief, maintains its principal place of business in California.

16. Complete diversity therefore exists between Plaintiff and Defendant.

17. Plaintiff invokes this Court's diversity jurisdiction under 28 U.S.C. § 1332(a).

18. Plaintiff alleges in good faith that the amount placed in controversy exceeds $75,000, exclusive of interest and costs, when the economic consequences alleged herein are considered in the aggregate, including alleged impairment of identifiable home-equity financing opportunities and other consequential economic loss.

19. Plaintiff sought approximately $107,000 in home-equity financing from Point and thereafter pursued identifiable home-equity transactions with other providers concerning the same property.

20. Plaintiff alleges that the inaccurate appearance of an additional second-position property interest had the capacity to reduce apparent available equity and affect underwriting or title review in those specifically identified transactions.

21. Plaintiff acknowledges that an approximately $257,000 recorded judgment was independently material to subsequent financing decisions and does not allege that Point alone caused every subsequent financing denial.

22. Plaintiff seeks consequential financing-related damages only to the extent discovery and admissible evidence establish that Point's inaccurate designation was actually reviewed, relied upon, or materially contributed to impairment of a particular financing transaction.

23. Plaintiff does not seek the $257,000 judgment itself as damages, does not seek recovery based merely upon the denial of Point's own application, and does not seek damages for hypothetical or unidentified financing opportunities.

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District, including the effect of Point's designation upon insurance covering Plaintiff's Florida residence and the resulting delay and economic consequences experienced by Plaintiff in Florida.

## III. PARTIES

25. Plaintiff Nick Miletak is an individual residing in Port St. Lucie, St. Lucie County, Florida.

26. Plaintiff owns and resides at 256 Southwest Ridgecrest Drive, Port St. Lucie, Florida 34953 ("the Property").

27. Defendant Point Digital Finance, Inc. is a Delaware corporation incorporated under file number: 5575001 with an incorporation date of 8/11/2014 and with its principal place of business at 444 High Street, Floor 4, Palo Alto, California.

28. At all material times, Point acted through employees and agents acting within the course and scope of their employment or agency, including personnel responsible for insurance coordination in connection with Point's proposed home-equity transactions.

## IV. FACTUAL ALLEGATIONS

**A. Point affirmatively caused itself to be identified as a second-position interest**

29. In approximately November 2024, Plaintiff had an AAA homeowners-insurance policy for the Property bearing policy number PKG701415910.

30. Plaintiff applied to Point for a proposed home-equity transaction seeking approximately $107,000.

31. The Point transaction had not closed and Point had not advanced funds when Point began communicating directly with AAA concerning Plaintiff's homeowners policy.

32. On or about November 5, 2024, Point's Insurance Coordinator, Mary Jane San Andres, sent AAA an Evidence of Insurance/Loss Payee request concerning Plaintiff and the Property.

33. Point requested that the homeowners policy identify:

**Point Digital Finance, Inc.**

**ISAOA/ATIMA**

**P.O. Box 192**

**Palo Alto, California 94302**

**Loan/Application No. 2024293-IDUFI**

**Lien Position: 2nd**

34. Point's request expressly stated that the requested change was effective November 5, 2024.

35. Point's communication further stated in substance that after the transaction had closed, Point would contact the insurer again to update the designation to its servicer's loss-payee clause.

36. Point therefore affirmatively undertook responsibility for communicating information concerning its asserted mortgagee/loss-payee status to Plaintiff's insurer and

contemplated further insurance-related communication associated with the status of the proposed transaction.

37. On November 7 and November 8, 2024, Point's insurance coordinator repeatedly asked AAA to confirm that Point had been placed in the second lien position.

38. On November 8, 2024, AAA confirmed to Point that Point was listed in the second lien position.

39. At that time, Point had not funded Plaintiff's transaction.

40. Point had not recorded a mortgage.

41. Point had not acquired any lien upon the Property.

42. Point nevertheless caused or requested an insurance record representing Point as occupying a second-position mortgagee/loss-payee status.

**B. The proposed Point transaction failed and Point acquired no property interest**

43. Point thereafter continued underwriting Plaintiff's proposed transaction.

44. During that process, Point identified an approximately $257,000 civil judgment recorded against Plaintiff.

45. Plaintiff provided Point with information concerning the judgment and Plaintiff's position concerning its effect on his Florida homestead.

46. On or about September 11, 2025, Point denied Plaintiff's application.

47. Point never funded the proposed transaction.

48. Plaintiff never received the approximately $107,000 sought from Point.

49. No closing occurred.

50. No Point mortgage was executed and recorded against the Property.

51. Point never acquired an assignment, lien, security interest, or other enforceable property interest in the Property.

52. The contemplated factual predicate for Point's insurance designation therefore ceased to exist when Point terminated the proposed transaction without funding or closing it.

53. Point knew through its own records that it had denied Plaintiff's application and that no transaction had closed or been funded.

54. Point also knew that it had previously caused or requested its own identification as a second-position mortgagee/loss payee on Plaintiff's homeowners-insurance records.

55. Having affirmatively undertaken to communicate its claimed interest to Plaintiff's insurer, Point failed to exercise reasonable care to communicate that the claimed interest had never materialized once Point terminated the transaction.

56. Point did not instruct AAA to remove its loss-payee/mortgagee designation when it denied Plaintiff's application in approximately September 2025.

57. Instead, the designation remained unresolved for approximately nine additional months.

**C. Point's designation subsequently affected Plaintiff's Trident insurance claim**

58. Plaintiff subsequently obtained homeowners-insurance coverage through Trident.

59. Trident's underwriting records reflected Point Digital Finance as a mortgagee associated with Plaintiff's Property.

60. Plaintiff thereafter presented homeowners-insurance claim number 26FL176165652 to Trident arising from water-overflow damage to the Property.

61. Plaintiff and Trident reached a settlement of that claim in June 2026.

62. On June 23, 2026, Trident's representative provided Plaintiff with a settlement release for execution.

63. Plaintiff executed and notarized that settlement agreement and returned it electronically to Trident on June 23, 2026.

64. On June 24, 2026, however, Trident informed Plaintiff that its records showed Point Digital Finance as the mortgagee.

65. Trident requested documentation establishing the identity of the actual lender with an interest in the Property so that Trident could issue the settlement check to the proper parties.

66. Plaintiff explained to Trident that Point had never funded a loan and therefore no documentation could exist showing a transfer of a Point mortgage to another lender.

67. Trident then advised Plaintiff that the underwriting application identified Point Digital Finance, under loan/application number 2024293-IDUFI, as the disclosed mortgage.

68. Trident further advised that information concerning Point was also reflected in Plaintiff's prior AAA policy.

69. Trident expressly required clarification and proof that Point did not have an interest in Plaintiff's Property.

70. Trident advised that, absent such clarification, Trident could not omit Point from the settlement check under the policy and applicable law.

71. Thus, the inaccurate appearance of Point as a mortgagee or loss payee caused Trident to require corrective evidence before settlement payment could proceed in the proper form.

**D. Point finally directs removal of the designation**

72. On June 24, 2026, after Plaintiff discovered and complained about the problem, Point's Insurance Coordinator Team Lead contacted AAA.

73. Point instructed AAA:

"Please remove our loss payee/mortgagee clause, as the application did not go through."

74. Point identified the same Point Digital Finance mortgagee designation and application number 2024293-IDUFI that had been added during the 2024 underwriting process.

75. Point's June 24, 2026 removal instruction constitutes contemporaneous confirmation that Point's designation remained associated with an application that had not gone through and that removal was necessary.

76. Nothing identified in Point's correspondence indicates that any Point mortgage had ever been recorded, satisfied, transferred, or released because no Point mortgage ever existed.

77. Point's corrective action occurred only after Plaintiff and Trident discovered that the designation was interfering with administration of the insurance settlement.

**E. Trident revises the settlement documentation and issues payment**

78. After Plaintiff supplied documentation establishing that Point had no interest in the Property, Trident prepared a revised settlement release reflecting the corrected mortgagee information.

79. On June 25, 2026, Trident advised Plaintiff that, once it received the executed revised release, it would forward the settlement payment.

80. Plaintiff had the revised settlement documentation executed and notarized and provided it to Trident on June 26, 2026.

81. Trident subsequently prepared and mailed the settlement payment.

82. On July 2, 2026, Trident mailed the settlement check by certified United States Mail.

83. On July 6, 2026, Trident provided Plaintiff with certified-mail tracking number 9589 0710 5270 1533 4966 64 and confirmed that the check had been mailed July 2.

84. Plaintiff received the settlement check on July 7, 2026.

85. Plaintiff therefore lost the use of the settlement proceeds during the period in which Point's inaccurate mortgagee designation had to be investigated and corrected and the settlement documentation revised.

86. Plaintiff also expended time and incurred expenses communicating with Trident, Point, AAA, and others to establish that Point had no mortgage or other property interest and to clear the designation so that the insurance proceeds could be properly issued.

**F. Point later admits that it never possessed any interest in the Property**

87. On July 29, 2026, Point's legal department responded in writing to Plaintiff's correspondence concerning the mortgagee designation.

88. Point stated that it had reviewed the file for application number 2024293-IDUFI.

89. Point expressly confirmed that Plaintiff's application had been denied.

90. Point expressly confirmed that the proposed transaction had never been funded.

91. Point further confirmed that it "does not hold, and has never held, a recorded mortgage, assignment, or other lawful interest" in Plaintiff's Property.

92. Point also acknowledged Plaintiff's report that a company administering a separate insurance settlement had informed him that payment could not properly proceed without addressing Point's purported interest.

93. Point stated that it had no right to those proceeds and offered to confirm directly to the settling company that Point had no interest in them.

94. Point's July 29, 2026 statements confirm that the problem was not the continuing existence of a former Point mortgage.

95. No Point mortgage ever existed.

96. Rather, an insurance designation affirmatively requested during underwriting remained after the underlying proposed transaction failed and after Point knew it had acquired no corresponding property interest.

**G. Consequential economic effects**

97. After the failed Point transaction, Plaintiff sought identifiable home-equity financing or home-equity investment arrangements from other providers, including Splitero, Unlock, and Hometap.

98. Those applications concerned Plaintiff's specific Property and were not generalized hopes of obtaining financing from the public at large.

99. Plaintiff understands that the approximately $257,000 recorded judgment was a principal reason identified in connection with denials or adverse underwriting decisions.

100. Plaintiff does not allege, without evidentiary support, that Point alone caused those denials.

101. At the same time, the inaccurate appearance of a second-position Point mortgagee or lender objectively represented an additional encumbrance or financial interest that did not actually exist.

102. The existence or apparent existence of additional liens or lender interests is information capable of affecting available equity calculations, title review, lien-priority analysis, and home-equity underwriting.

103. Plaintiff alleges, upon information and belief where appropriate, that discovery concerning the underwriting files of the identified providers may establish whether Point's apparent interest was seen, considered, or relied upon.

104. Plaintiff seeks damages arising from such financing impairment only if competent evidence establishes that Point's inaccurate designation materially contributed to an identifiable loss.

105. Plaintiff does not seek damages based upon conjecture concerning unidentified lenders, unidentified transactions, or hypothetical financing.

**H. Consequential Financial and Personal Harm**

106. Plaintiff sought home-equity financing in substantial part to obtain funds necessary to retain counsel and meet expenses associated with defending against and appealing an approximately $257,000 judgment.

107. Plaintiff was unable to obtain the sought financing from Point and thereafter pursued identifiable financing transactions with other home-equity providers.

108. Plaintiff acknowledges that the recorded judgment itself was a substantial factor considered by prospective financing providers. Plaintiff nevertheless alleges that Point's continued appearance as an additional second-position mortgagee or lienholder created a materially inaccurate representation concerning the encumbrances and available equity associated with the Property.

109. Plaintiff seeks discovery concerning whether any specifically identified financing provider reviewed, considered, or relied upon Point's apparent second-position interest in evaluating Plaintiff's application, available equity, lien priority, or title.

110. To the extent competent evidence establishes that Point's inaccurate designation materially impaired an identifiable financing transaction, Plaintiff alleges that the resulting inability to access equity deprived him of funds he intended to use to retain counsel and address expenses associated with the litigation resulting in the approximately $257,000 judgment.

111. Plaintiff ultimately proceeded without retained counsel in material portions of the litigation and was unsuccessful in obtaining relief from the judgment.

112. Enforcement of the judgment thereafter resulted in wage garnishment commencing on or about May 15, 2026.

113. The garnishment substantially impaired Plaintiff's ability to meet household and property-related expenses.

114. Because of those financial circumstances, Plaintiff relisted his residence for sale in approximately May 2026.

115. Plaintiff alleges that these circumstances caused substantial financial stress and aggravated a pre-existing susceptibility to anxiety and depressive symptoms.

116. Plaintiff does not allege that Point caused the underlying $257,000 judgment itself. Plaintiff seeks consequential damages arising from the foregoing sequence only to the extent competent evidence establishes that Point's conduct was a substantial legal cause of an identifiable financing loss and that the subsequent damages were reasonably foreseeable and not too remote under Florida law.

**COUNT I**

**NEGLIGENCE**

117. Plaintiff realleges paragraphs 1 through 116 as though fully set forth herein.

118. Point voluntarily and affirmatively undertook to communicate information concerning its claimed mortgagee and loss-payee status to Plaintiff's homeowners insurer.

119. Point did not merely receive information created independently by AAA.

120. Point affirmatively requested that AAA add Point's loss-payee clause, identified itself as occupying the second lien position, supplied an application or account number, requested confirmation of its lien position, and contemplated later updating the insurance designation following closing.

121. Florida recognizes that one who undertakes to provide a service may thereby assume a duty to exercise reasonable care in performing the undertaking and to avoid increasing a foreseeable risk of harm through negligent performance. See *Clay Electric Cooperative, Inc. v. Johnson*, 873 So. 2d 1182, 1185–86 (Fla. 2003); *Union Park Memorial Chapel v. Hutt*, 670 So. 2d 64, 66–67 (Fla. 1996).

122. By affirmatively undertaking to supply and maintain information concerning Point's claimed interest in Plaintiff's insured Property, Point assumed a duty to exercise reasonable care within the scope of that undertaking.

123. At a minimum, once Point itself terminated the proposed transaction without closing or funding it, Point had a duty to exercise reasonable care with respect to the insurance designation Point itself had caused or requested.

124. Point knew or reasonably should have known that mortgagee and loss-payee information supplied to a homeowners insurer can affect who is entitled to insurance proceeds and the conditions under which an insurer may issue payment.

125. The risk was particularly foreseeable because Point itself was acting through personnel whose function was insurance coordination.

126. Point breached its duty of reasonable care by, among other things:

a. requesting that Point be identified as a second-position mortgagee/loss payee before the contemplated transaction had closed;

b. failing to implement a reasonable procedure to remove or correct that designation when the transaction failed;

c. failing to notify AAA promptly after Point denied the application and knew that no Point mortgage or lien had arisen;

d. allowing Point's asserted mortgagee status to remain associated with Plaintiff's insurance records for approximately nine months after denial;

e. failing to reconcile Point's insurance records with the known fact that no transaction had closed or been funded; and

f. failing to take reasonable action to correct information within the scope of the insurance-related undertaking Point itself initiated.

127. Point's conduct increased the risk that insurers would treat Point as possessing a mortgagee or loss-payee interest that Point did not actually possess.

128. That risk materialized when Trident treated Point as a mortgagee and required proof that Point had no interest before the settlement payment could proceed without Point.

129. Trident's response was not based upon an actual Point lien.

130. It was based upon insurance information identifying Point as possessing an interest that Point's own legal department subsequently confirmed never existed.

131. Point's negligence was an actual and legal cause of additional investigation, documentation, revision of settlement materials, delay in Plaintiff's receipt and use of settlement proceeds, and resulting pecuniary loss.

132. Plaintiff suffered damages including loss of use of funds, reasonable corrective expenses, and other economic damages established by competent evidence.

**WHEREFORE**, Plaintiff requests judgment against Point Digital Finance, Inc. for compensatory damages, prejudgment interest where legally recoverable, taxable costs, and all other relief the Court deems appropriate.

## COUNT II
## TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIP
### Trident Insurance Claim

133. Plaintiff realleges paragraphs 1 through 116 as though fully set forth herein.

134. Plaintiff had an existing, specific, and legally protected business relationship with Trident arising from Plaintiff's homeowners policy and, more specifically, the adjustment and agreed settlement of claim number 26FL176165652.

135. This was not a relationship with the community at large or an unidentified prospective customer.

136. By June 23, 2026, Plaintiff and Trident had reached a settlement and Trident had supplied Plaintiff with settlement documents for execution.

137. Point intentionally caused itself to be represented to Plaintiff's insurer as a second-position mortgagee and loss payee during the underwriting of Point's proposed transaction.

138. Point knew that such a designation was intended to communicate to insurers that Point claimed an interest requiring recognition in connection with the insured Property and insurance proceeds.

139. Point thereafter knowingly denied Plaintiff's application, knowingly failed to fund the transaction, and knowingly acquired no mortgage or other interest in Plaintiff's Property.

140. Nevertheless, after acquiring actual knowledge that the proposed transaction had terminated without Point acquiring the interest underlying its insurance designation, Point intentionally failed to withdraw or correct the designation it had affirmatively caused to be placed.

141. Point's conduct was not justified by any existing mortgage, lien, loss-payee right, assignment, or ownership interest because Point subsequently admitted that none had ever existed.

142. By June 24, 2026, Point had actual notice that its designation was affecting administration of Plaintiff's insurance settlement.

143. When the issue was brought to Point's attention, Point immediately instructed AAA to remove its loss-payee/mortgagee clause because "the application did not go through."

144. Trident had already treated the designation as operative and required proof that Point had no interest before Point could be omitted from the settlement payment.

145. Point's continued designation therefore interfered with the performance and completion of Plaintiff's existing insurance-settlement relationship with Trident.

146. As a direct and proximate result, Plaintiff was required to obtain corrective information, provide additional documentation, execute revised settlement paperwork, and wait for the payment process to proceed after the mortgagee issue was corrected.

147. Plaintiff suffered resulting pecuniary damage.

148. Under Florida law, tortious interference with a business relationship requires an existing business relationship, the defendant's knowledge of the relationship, intentional and unjustified interference, and resulting damages. See *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814–15 (Fla. 1994).

149. Plaintiff pleads this count as an intentional-tort theory distinct from Count I's negligence theory and seeks recovery only to the extent the evidence establishes the required actual knowledge and intentional interference.

WHEREFORE, Plaintiff requests judgment against Point Digital Finance, Inc. for compensatory damages, prejudgment interest where legally recoverable, taxable costs, and all other relief the Court deems appropriate.

## V. DAMAGES

150. As a direct and proximate result of Point's conduct, Plaintiff has suffered or alleges damages including, to the extent established by competent evidence:

a. loss of use of the Trident settlement proceeds during the period reasonably attributable to the mortgagee-designation problem;

b. reasonable out-of-pocket expenses incurred in investigating, documenting, and correcting Point's purported mortgagee/loss-payee interest;

c. consequential economic losses resulting from delay in receipt and availability of insurance proceeds;

d. economic loss arising from impairment of specifically identified financing transactions, but only to the extent evidence establishes actual reliance upon or material consideration of Point's inaccurate designation;

e. prejudgment interest on liquidated losses where authorized by Florida law; and

f. taxable costs.

151. Plaintiff does not seek recovery of the approximately $257,000 judgment against him as damages in this action.

152. Plaintiff does not seek damages merely because Point declined to fund Plaintiff's home-equity application.

153. Plaintiff does not allege that every subsequent financing denial was caused by Point.

154. Plaintiff seeks only those consequential damages that can be established with reasonable certainty and causally connected to Point's challenged conduct.

155. Plaintiff reserves the right to amend the amount and categories of damages as permitted by the Federal Rules of Civil Procedure if discovery supplies additional competent evidence concerning causation and loss.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nick Miletak respectfully requests that the Court:

A. Enter judgment in Plaintiff's favor and against Point Digital Finance, Inc.;

B. Award Plaintiff compensatory damages in an amount established by the evidence;

C. Award consequential economic damages to the extent recoverable under Florida law and established by competent, non-speculative evidence;

D. Award prejudgment interest where authorized;

E. Award taxable costs; and

F. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

DATED: August 21, 2026.

Respectfully submitted,

Nick Miletak

Nick Miletak

Plaintiff, Pro Se

256 Southwest Ridgecrest Drive

Port St. Lucie, Florida 34953

Email: nmiletak@msn.com

Telephone: 408-533-5689